**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>CHRISTINE WALLIS,<br><br>Plaintiff,<br><br>v.<br><br>PROGRESS SOFTWARE CORPORATION and CLEARWATER CREDIT UNION,<br><br>Defendants. | MDL No. 1:23-md-03083-ADB-PGL<br><br>DIRECT FILED COMPLAINT [& JURY DEMAND] PURSUANT TO ORDER REGARDING DIRECT FILING<br><br>CIVIL ACTION NO. 1:26-cv-10566 |

Plaintiff Christine Wallis ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to herself and on information and belief as to all other matters, brings this Class Action Complaint against Defendants Progress Software Corporation ("Progress" or "PSC") and Clearwater Credit Union ("CCU") (collectively with Progress, "Defendants"), and in support thereof alleges as follows:

## NATURE OF ACTION

1. This Complaint is being directly filed into this MDL proceeding pursuant to the Court's MDL Order No. 12 and incorporates Plaintiffs' Set of Omnibus Pleading Facts (ECF No. 908).

2. Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' Personally Identifiable Information ("PII"). According to the Code of Federal Regulations ("CFR"), PII is "information

that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual."[1]

3. As used throughout this Complaint and previously defined in the paragraph above, "PII" is further defined as all information exposed by the data breach ("Data Breach"), including all or any part or combination of the follow: including individuals' full names, Social Security numbers, and bank / financial account numbers.

4. Defendant PSC is a Massachusetts-based software company that offers a wide range of software products and services to corporate and governmental entities throughout the United States and the world, including cloud hosting and secure file transfer services such as MOVEit Transfer.

5. Defendant CCU is a credit union based in Montana that offers its members savings. CCU is Montana's largest Community Development Financial Institution ("CDFI") and manages assets for over 62,000 members, totaling over $1 billion.[2]

6. CCU possessed and controlled Plaintiff's and Class Members' PII because, upon information and belief, CCU processes information necessary to facilitate members' banking transactions. Upon information and belief, CCU provides this PII to a third-party vendor who uses MOVEit to transfer CCU members' PII.

7. Plaintiff received a data breach notification from CCU informing Plaintiff of data security incident it had suffered.

8. Upon information and belief, the incident involved MOVEit, which a CCU third-party vendor used to transfer data.

---

[1] 2 C.F.R. § 200.1

[2] *Our History*, CCU, https://clearwatercreditunion.org/about-us/who-we-are/our-history/ (last visited February 4, 2026).

9. Upon information and belief, the data compromised in the Data Breach included the personal information of CCU members including individuals' full names in combination with Social Security numbers, and bank / financial account numbers.

10. Plaintiff's and Class Members' PII was compromised between May 29 and May 31, 2023, and CCU subsequently began notifying Plaintiff and Class Members on June 30, 2023.

11. During their business operations, Defendants acquired, collected, utilized, and derived a benefit from Plaintiff's and Class Members' PII. Therefore, Defendants owed and otherwise assumed statutory, regulatory, contractual, and common law duties and obligations, including keeping Plaintiff's and Class Members' PII confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach described below.

12. Despite its duties to Plaintiff and Class Members related to and arising from its cloud hosting and secure file transfer services and applications involving MOVEit, PSC stored, maintained, and/or hosted Plaintiff's and Class Members' PII on its MOVEit Transfer tool that was negligently and/or recklessly configured and maintained so as to contain security vulnerabilities that resulted in multiple breaches of its network and systems, or of its customers' networks and systems. These security vulnerabilities existed as far back as 2021. As a result of the Data Breach, unauthorized third-party cybercriminals gained access to and obtained Plaintiff's and Class Members' PII.

13. Plaintiff brings this class action lawsuit on behalf of herself and those similarly situated to address Defendants' inadequate safeguarding of Class Members' PII that they collected, maintained, transferred, and/or hosted.

14. Upon information and belief, Defendants maintained, transferred, and/or hosted the PII of hundreds of thousands of individuals in a negligent manner. In particular, the PII was maintained on computer systems and networks that utilized MOVEit, which contained security vulnerabilities. These security vulnerabilities led to dozens of cyberattacks, including the present Data Breach that resulted in the theft of Plaintiff's and Class Members' PII.

15. Upon information and belief, CCU negligently selected a vendor who utilized PSC's MOVEit Transfer tool to store and transfer Plaintiff's and Class Members' PII despite the fact that the MOVEit Transfer tool contained security vulnerabilities.

16. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants because other file transfer programs had previously been subjected to criminal hacking, and thus Defendants were on notice that failing to take appropriate design and protective measures would expose and increase the risk that PII could be compromised and stolen.

17. The cyberattack at issue was carried out by the well-known Russian cybergang, CLoP.[3]

18. Hackers such as CLoP can and do offer unencrypted, unredacted PII for sale to other criminals. The exposed PII of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.[4]

---

[3] Wes Davis, *MOVEit Cyberattacks: Keeping Tabs on the Biggest Data Theft of 2023*, The Verge (Nov. 10, 2023, 2:26 PM), https://www.theverge.com/23892245/moveit-cyberattacks-clopransomware-government-business; *CISA and FBI Release Advisory on CL0P Ransomware Gang Exploiting MOVEit Vulnerability*, America's Cyber Defense Agency (June 7, 2023), https://www.cisa.gov/news-events/news/cisa-and-fbi-release-advisory-cl0p-ransomware-gang-exploiting-moveit-vulnerability.

[4] Stefanie Schappert, *Cl0p dumps all MOVEit victim data on clearnet, threat insiders talk ransom strategy*, cybernews, (updated Nov. 15, 2023), https://cybernews.com/security/clop-publish-all-moveit-victim-ransom-data-clearweb/.

19. Plaintiff and Class Members now face a current and ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.[5]

20. Upon information and belief, this PII was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiff and Class Members.

21. When PSC's customers use the MOVEit Transfer tool, they entrust PSC with confidential files, including Plaintiff's and Class Members' PII, and PSC accepts responsibility for securely maintaining such PII.

22. When CCU's members use its services, they entrust CCU with their confidential files, including Plaintiff's and Class Members' PII, and CCU accepts responsibility for securely maintaining such PII.

23. Defendants have not made any assurances that they have adequately enhanced their data security practices to sufficiently safeguard from a similar vulnerability in the MOVEit Transfer tool in the future.

24. While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief, Defendants breached their duties and obligations by failing, in one or more of the following ways: (i) failing to design, implement, monitor, update, patch, and maintain reasonable software and/or network safeguards against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to comply with industry-standard data security

---

[5] Travis Jarae, *The Social Security number isn't dead yet, but its days are numbered*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/cybersecurity/363638-the-social-security-number-isnt-dead-yet-but-its-days-are-numbered/.

practices; (v) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (vi) failing to encrypt or adequately encrypt Plaintiff's and Class Members' PII; and (vii) otherwise failing to secure the software and hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

25. As a result of Defendants' unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) lost value of their PII; (viii) anxiety, annoyance, and nuisance; and (ix) the continued risk to their PII, which remains in the control of Defendants, and which is subject to further breaches, as long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

26. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory, consequential, and nominal damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, injunctive relief including improvements to Defendants' data security systems, and future annual audits.

27. Accordingly, Plaintiff brings this action against Defendants seeking redress for their unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of

contract against CCU; (iv) breach of third-party beneficiary contract against PSC; (vi) unjust enrichment; and (vii) declaratory judgment.

**PARTIES**

28. Plaintiff Christine Wallis is, and was at all relevant times, an individual and citizen of the state of Montana.

29. PSC is a Delaware corporation and maintains its headquarters and principal place of business at 15 Wayside Road, 4th Floor, Burlington, Massachusetts 01803. PSC offers the service MOVEit, which experienced the Data Breach underlying Plaintiff's claims.

30. CCU is a credit union based in Montana and maintains its headquarters and principal place of business at 3600 Brooks St., Missoula, MT 59801. A vendor of CCU used MOVEit Transfer to transfer Plaintiff's and Class Members' data.

**JURISDICTION**

31. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which one or more class members are citizens of states different from Defendants.

32. Absent the Court's MDL Order No. 12 (Direct Filing Order), Plaintiff would have otherwise filed the case in in the United States District Court for the District of Montana. That court has personal jurisdiction over Defendant CCU because CCU's headquarters is located in that District. That court also has personal jurisdiction over Defendant PSC because PSC conducts substantial business in that jurisdiction and because Plaintiff's claims arise out of and relate to Defendants' contacts with, and conduct within, that District. Additionally, venue would be proper

in the District of Montana pursuant to 28 U.S.C. 1391(a)(1) because a substantial part of the events giving rise to this action occurred in that District.

## FACTUAL BACKGROUND

### A. PSC's Business.

33. The factual allegations relating to PSC's business and its MOVEit software, as well as the underlying Data Breach, are contained in the Plaintiffs' Omnibus Set of Additional Pleading Facts (ECF No. 908) and are also contained in pages 4-11 and pages 253-374 of Plaintiffs' Corrected Bellwether Consolidated Class Action Complaint (ECF No. 1332), both of which are incorporated herein.

34. Progress, which is based in Burlington, Massachusetts, is a software company that offers a wide range of products and services to government agencies and corporate entities across the United States and around the world, including MOVEit.

35. MOVEit is a "[m]anaged File Transfer and automation software that guarantees the security of sensitive files both at-rest and in-transit, ensures reliable business processes and addresses data security compliance requirements."[6]

36. As a condition of receiving secure file transfer services, Progress requires that its government and corporate customers entrust it and its MOVEit Transfer tool with highly sensitive PII belonging to Plaintiff and Class Members.

37. Because of the highly sensitive nature of the PII that Progress acquires, maintains, and transfers, Progress "guarantees the security of sensitive files,"[7] and promises, among other things, to: keep customers' files private; comply with industry standards related to data security

---

[6] *Applications & Experiences That Set You Apart*, Progress, https://www.progress.com/docs/default-source/default-document-library/progress-corporate-brochure-2023-rgb.pdf?sfvrsn=a0b1f671_3 (last visited Feb. 4, 2026).
[7] *Id.*

and maintenance of its customers' files and the PII contained therein; only disclose the sensitive information for business purposes and reasons related to the services it provides; and provide adequate notice to individuals if their PII is disclosed without authorization.

38. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Progress assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the security of Plaintiff's and Class Members' PII to protect it from unauthorized disclosure and exfiltration.

39. Plaintiff and Class Members relied on Progress to keep their PII confidential and securely maintained and to only make authorized disclosures of this information, which Progress failed to do.

**B. CCU's Business.**

40. CCU is Montana's largest CDFI and is one of only six credit unions in the United States that is a member of the Global Alliance for Banking on Values.[8] CCU has continued to expand across Montana and neighboring states and now has a presence in 37 Montana counties.[9]

41. CCU provides its members with savings and checking accounts, credit cards, loans, certificates of deposit, and other financial services.

42. As a condition of providing banking services, CCU requires that members entrust it with highly sensitive PII, including that belonging to Plaintiff and Class Members.

43. Because of the highly sensitive nature of the PII that CCU acquires, maintains on its network, and provides to third parties, including Defendant Progress and the third-party who

---

[8] *Values-Based Banking*, CCU, https://clearwatercreditunion.org/values-based-banking/ (last visited February 4, 2026).

[9] *Our History*, *supra* n. 2.

uses MOVEit Transfer, CCU assures its members that they "respect [customer] privacy, and [are] dedicated to protecting it."[10]

44. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, CCU assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the security of Plaintiff's and Class Members' PII to protect it from unauthorized disclosure and exfiltration.

45. Plaintiff and Class Members relied on CCU to keep their PII confidential and securely maintained and to only make authorized disclosures of this information, which CCU failed to do.

46. CCU at the very least, negligently assessed and managed the cybersecurity risk posed by its third-party service providers including Defendant Progress and the third-party vendor who used MOVEit Transfer.

**C. The Data Breach.**

47. On May 31, 2023, Progress reported a vulnerability in MOVEit Transfer and MOVEit Cloud (CVE-2023-34362) that could lead to escalated privileges and potential unauthorized access to the environment. Progress purportedly launched an investigation, alerted MOVEit customers of the issue and provided mitigation steps.

48. Progress applied additional patches on June 9 and June 16, 2023, to purportedly address other vulnerabilities that were discovered.

49. The Russian cyber gang CLoP took responsibility for the attack—which began on May 27, 2023—and began attempts to ransom and exploit data accessed from MOVEit.

---

[10] *Online Privacy Statement*, CCU (last updated October 1, 2024), https://clearwatercreditunion.org/privacy-policy-statement/.

50. CCU was one of the companies whose data was accessed and stolen.

51. Despite the Data Breach occurring in May 2023, CCU did not confirm that Plaintiff's and Class Members' PII was compromised until July 30, 2024—over a year after the Data Breach occurred.

52. Plaintiff later received a letter from CCU, informing her that her PII was impacted by the Data Breach.

53. Defendants negligently maintained Plaintiff's and Class Members' PII, which allowed unauthorized cybercriminals to access and exfiltrate the PII through the Data Breach including individuals' full names, Social Security numbers, and bank / financial account numbers.

54. Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

55. Plaintiff and Class Members permitted their PII to be provided to Defendants with the reasonable expectation and understanding that Defendants would comply with their obligations to keep said PII confidential and secure from unauthorized access and issue timely notice of any security breaches.

56. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years, including recent similar attacks against secure file transfer companies such as Accellion and Fortra by the same Russian cyber gang at issue here: CLoP.[11]

[11] *See* Bill Toulas, *Fortra Shares Findings on GoAnywher MFT Zero-Day Attacks*, BleepingComputer (Apr. 19, 2023), https://www.bleepingcomputer.com/news/security/fortra-shares-findings-on-goanywhere-mft-zero-day-attacks/; *see also* Ionut Ilascu, *Global Accellion Data Breaches Linked to Clop Ransomware Gang*, BleepingComputer (Feb. 22, 2021),

57. Therefore, because of the type of data and PII maintained, Defendants knew or should have known that their systems and records would be targeted by cybercriminals.

**D. Plaintiff's Experience.**

58. Plaintiff is a customer of CCU. In order to apply for and open a bank account with CCU, Plaintiff was required to entrust CCU with her PII.

59. During the summer of 2023, Plaintiff logged into her online banking account with CCU and was alerted of the Data Breach.

60. Plaintiff is very careful about sharing her sensitive PII. She stores any documents containing her PII in a safe and secure location and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to CCU had she known of CCU's lax data security policies.

61. As a result of the Data Breach, Plaintiff has suffered actual misuse of her PII. In the winter of 2024, Plaintiff's online banking account was accessed by a device with an IP address that was unauthorized by Plaintiff and from a location in which Plaintiff did not reside.

62. As a result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including spending time changing the passwords to her accounts with CCU, and spending time monitoring and reviewing her financial accounts and financial statements on a daily basis. Plaintiff spent significant time dealing with the Data Breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

---

https://www.bleepingcomputer.com/news/security/global-accellion-data-breaches-linked-to-clop-ransomware-gang/.

63. Moreover, since the Data Breach, the number of spam calls, texts, and emails that Plaintiff receives has substantially increased. Plaintiff has noticed this is an increase from the amount of spam she received prior to the Data Breach.

64. Plaintiff suffered actual injury in the form of damages and diminution in the value of her PII—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

65. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has suffered from anxiety, confusion, and increased concern for the loss of privacy.

66. Plaintiff has suffered imminent and impending injury arising from the present and persistent risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of cybercriminals.

67. As a result of the Data Breach, Plaintiff anticipates spending considerable time on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. Plaintiff is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

68. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

**E. The Data Breach was Foreseeable**

71. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendants' data security system was breached, including,

specifically, the significant costs that would be imposed on Plaintiff and Class Members because of a breach.

72. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their network, amounting to millions of individuals' detailed PII. Consequently, Defendants were, or should have been, fully aware of the significant number of individuals who would be harmed by the exposure of the unencrypted data.

73. As explained by the Federal Bureau of Investigation ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

74. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches preceding the date of the Data Breach.

75. Notably, Credit Unions have reported 892 cyber incidents from September 1, 2023, to May 1, 2024.[13] Of those reports, 73% of the attacks were "related to the use or involvement of a third party."[14]

76. In light of the recent high profile cybersecurity incidents at other file transfer and storage companies, including Accellion and Fortra, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

---

[12] *See Ransomware Prevention and Response for CISOs*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited February 4, 2026).

[13] National Credit Union Administration, *Cybersecurity and Credit Union System Resilience Annual Report to Congress*, (last modified Nov. 14, 2024) https://ncua.gov/news/publication-search/cybersecurity/cybersecurity-and-credit-union-system-resilience-annual-report-congress-2#:~:text=From%20September%201%2C%202023%2C%20through,involvement%20of%20a%20third%20party.

[14] *Id.*

77. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.[15]

78. Therefore, the increase in such attacks, and the attendant risk of future attacks, were widely known to the public and to anyone in Defendants' industry, including Defendants.

### F. Value of PII

79. Individuals' PII remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[16] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

---

[15] *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware.

[16] Anita George, *Your Personal Data is for Sale on the Dark Web. Here's How Much it Costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[17] Zachary Ignoffo, *Dark Web Price Index 2021*, Privacy Affairs (June 10, 2023), https://www.privacyaffairs.com/dark-web-price-index-2021/.

[18] *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited February 4, 2026).

80. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

81. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[19]

82. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

83. The fraudulent activity resulting from the Data Breach may not come to light for years.

84. There is also a robust, legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

85. Moreover, there may be a time lag between when harm occurs versus when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

---

[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[20] *Report to Congressional Requesters*, GAO (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

86. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and the loss of other rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of its PII.

87. As such, future monitoring of financial and personal records is reasonable and necessary.

**G. Defendants Failed to Properly Protect Plaintiff's and Class Members' PII**

88. Defendants could have prevented this Data Breach by properly testing, monitoring, auditing, securing, and encrypting the systems containing Plaintiff's and Class Members' PII.

89. Defendants' negligence in not safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they maintain.

90. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

91. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

---

[21] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, FED. TRADE COMM. (May 2013), https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business.

92. The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and the concomitant damage to victims may continue for years.

93. To prevent and detect unauthorized cyberattacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- An awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary

folders supporting popular Internet browsers or compression/ decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[22]

94. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….
- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….
- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….
- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous

[22] *Id.* at 3-4.

(legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[23]

95. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

[23] *See Protecting Against Ransomware*, CISA, https://www.cisa.gov/news-events/news/protecting-against-ransomware (last updated Sept. 2, 2021).

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications][24]

96. Moreover, given that Defendants were maintaining the PII of Plaintiff and Class Members, Defendants could have and should have implemented all of the foregoing measures to prevent and detect cyberattacks.

97. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

98. Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' PII, an unauthorized criminal third party was able to access Defendants' network, and access Defendants' database and system configuration files and exfiltrate that data.

**H. Defendants Failed to Comply with FTC Guidelines**

99. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

---

[24] *See Human-Operated Ransomware Attacks: A Preventable Disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

100. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[25]

101. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

102. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

103. Defendants failed to properly implement basic data security practices.

104. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").

---

[25] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM., https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited February 4, 2026).

105. Defendants were always fully aware of their obligation to protect the PII of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

106. In light of the numerous high-profile data breaches aimed at companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, Accellion, and Capital One, Defendants were, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

107. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

1. Maintaining a secure firewall configuration;
2. Monitoring for suspicious or irregular traffic to servers;
3. Monitoring for suspicious credentials used to access servers;
4. Monitoring for suspicious or irregular activity by known users;
5. Monitoring for suspicious or unknown users;
6. Monitoring for suspicious or irregular server requests;
7. Monitoring for server requests for PII;
8. Monitoring for server requests from VPNs; and
9. Monitoring for server requests from Tor exit nodes.

108. The FTC publishes guides for businesses for cybersecurity[26] and protection of PII[27] which includes basic security standards applicable to all types of businesses.

109. The FTC recommends that businesses:

---

[26] *Start with Security: A Guide for Business*, FED. TRADE COMM., https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited February 4, 2026).
[27] *Protecting Personal Information: A Guide for Business*, *supra* n. 25.

1. Identify all connections to the computers where you store sensitive information.

2. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

3. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

4. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

5. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

6. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

7. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

8. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

9. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

110. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable

and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[28]

111. Because Defendants were entrusted with PII, they had, and have, a duty to keep that information secure.

112. Plaintiff and Class Members reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

113. Nonetheless, Defendants failed to prevent the Data Breach. Had Defendants properly maintained and adequately protected their systems, they could have prevented the Data Breach.

114. Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

115. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

[28] *Privacy and Security Enforcement: Press Releases*, FED. TRADE COMM., https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited February 4, 2026).

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

116. The foregoing frameworks are extant and applicable industry standards in the software and data management/transfer industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

117. Upon information and belief, Defendants failed to comply with one or more of the foregoing industry standards.

**I. Defendants' Negligent Acts and Breaches**

118. Defendants participated in and controlled the process of gathering PII from Plaintiff and Class Members.

119. Defendants therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, and testing of the data security policies and network systems. Defendants breached these obligations to Plaintiff and Class Members and/or were otherwise negligent because they failed to properly implement data security systems and policies for their network that would adequately safeguard Plaintiff's and Class Members' PII. Upon information and belief, Defendants' unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

1. Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members' PII;
2. Failing to properly monitor their data security systems for data security vulnerabilities and risk;
3. Failing to audit, test and assess the adequacy of their data security systems;
4. Failing to develop adequate training programs related to the proper handling of emails and email security practices;

5. Failing to develop and place uniform procedures and data security protections on their networks;

6. Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

7. Failing to properly review, assess, and manage the cybersecurity risk posed by third-party vendors and service providers;

8. Failing to ensure or otherwise require that they were compliant with FTC guidelines for cybersecurity;

9. Failing to ensure or otherwise require adherence to one or more of industry standards for cybersecurity discussed above;

10. Failing to implement or update antivirus and malware protection software in need of security updating;

11. Failing to require encryption or adequate encryption on their data systems; and

12. Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' PII provided to Defendants, which in turn allowed cyberthieves to access their IT systems.

## COMMON INJURIES & DAMAGES

120. As a result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

121. Due to the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) lost value of their PII;

and (viii) the continued risk to their PII, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

122. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the data. Criminals monetize PII by selling the stolen information on the black market to other criminals who then use the information to commit a variety of identity theft related crimes.

123. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

124. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

125. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[29] Criminals favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to

[29] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[30] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

126. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal information like the PII at issue here.[31] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[32] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[33]

127. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get

---

[30] *Id.*

[31] *What is the Dark Web?*, Microsoft 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web/.

[32] *Id.; DeNicola, supra* n. 29.

[33] *What is the Dark Web?*, *supra* n. 31.

> calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[34]

128. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.[35]

129. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

130. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[37]

---

[34] *Identity Theft and Your Social Security Number*, SOC. SEC. ADM., https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited February 4, 2026).
[35] *See Id.*
[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[37] *Identity Theft and Your Social Security Number*, *supra*, n. 34.

131. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

132. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[39] Defendants did not rapidly report to Plaintiff and the Class Members that their PII had been stolen.

133. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

134. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable amount of time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

135. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

136. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated

---

[38] *See 2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[39] *Id.*

that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[40]

137. The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (i) encrypting information stored on computer networks; (ii) retaining payment card information only as long as necessary; (iii) properly disposing of personal information that is no longer needed; (iv) limiting administrative access to business systems; (v) using industry-tested and accepted methods for securing data; (vi) monitoring activity on networks to uncover unapproved activity; (vii) verifying that privacy and security features function properly; (viii) testing for common vulnerabilities; and (ix) updating and patching third-party software.[41]

138. Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

**A. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

139. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach,

---

[40] Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*, FTC (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.
[41] *Protecting Personal Information: A Guide for Business*, *supra* n. 25.

and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

140. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect, because of the Data Breach.

141. These mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[42]

142. These mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[43]

143. In the event that Plaintiff and Class Members experience actual identity theft and fraud, the GAO Report explains that victims of identity theft will face "substantial costs and time

[42] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U. S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[43] *See IdentityTheft.gov*, FED. TRADE COMM., https://www.identitytheft.gov/Steps (last visited February 4, 2026).

to repair the damage to their good name and credit record."[44] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

**B. Lost Value of PII**

144. PII is a valuable property right.[46] Its value is axiomatic, considering the value of Big Data in corporate America and the criminal consequences of cyber thefts, which can include heavy prison sentences. Even this obvious risk/reward analysis illustrates beyond doubt that PII has considerable market value.

145. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[47] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48]

[44] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, *supra* n. 42.
[45] *IdentityTheft.gov*, *supra* n. 48.
[46] *See*, *e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[47] David Lazarus, *Column: Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[48] Data Coup, https://datacoup.com/, (last visited February 4, 2026).

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[49]

146. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

**C. Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

147. To date, Defendants have done almost nothing to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future.

148. Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, file false tax returns, take out loans or lines of credit, or file false unemployment claims.

149. It must be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when PII and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on

[49] *Frequently Asked Questions*, Nielsen, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited February 4, 2026).

> the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[50]

150. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

151. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[51] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

152. Consequently, Plaintiff and Class Members face a present and ongoing risk of fraud and identity theft for their entire lives.

153. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the ongoing risk of identity theft that arose from Defendants' Data Breach. This is a recurring future cost that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

---

[50] *See* GAO Report, at 29.

[51] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

**D. Injunctive Relief Is Necessary to Protect Against Future Data Breaches**

154. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the control of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

## CLASS ACTION ALLEGATIONS

155. Plaintiff brings this nationwide class action on behalf of herself, and all others similarly situated, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

156. The "Nationwide Class" that Plaintiff seeks to represent is defined as follows:

> All persons in the United States whose PII was accessed or acquired during the Data Breach as a result of the exploitation of Progress Software Corporation's MOVEit Transfer vulnerability (the "Class").

With a "Clearview Credit Union" Subclass defined as follows:

> All persons in the United States whose PII was compromised in the Data Breach where such PII was obtained through CCU's systems (the "CCU Subclass").

157. Excluded from the Class and Subclass are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

158. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

159. Numerosity, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII may have been improperly accessed in the Data Breach, and the Class and Subclasses are readily identifiable within Defendants' records.

160. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

1. Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;
2. Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
3. Whether Defendants had duties not to use the PII of Plaintiff and Class Members for non-business purposes;
4. Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;
5. Whether Defendants failed to properly review, assess, and manage the cybersecurity risk posed by third-party vendors and service providers;
6. Whether and when Defendants actually learned of the Data Breach;
7. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;
8. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;
9. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
10. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

11. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

12. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

13. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

14. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

161. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendants' misfeasance.

162. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was maintained and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

163. Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class

Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

164. Superiority, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

165. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

166. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, including their privacy policies, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

167. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

168. Unless a class-wide injunction is issued, Defendants may continue to fail to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

169. Further, Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

170. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

1. Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their PII;

2. Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their PII;

3. Whether Defendants failed to comply with their own policies, promises, applicable laws, regulations, and industry standards relating to data security;

4. Whether Defendants adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

5. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

6. Whether Defendants adequately reviewed, assessed, and managed the cybersecurity risks posed by third-party vendors and service providers;

7. Whether Defendants' data security practices related to the MOVEit Application prior to and during the Data Breach complied with applicable data security laws and regulations;

8. Whether Defendants' data security practices related to the MOVEit Application prior to and during the Data Breach were consistent with industry standards;

9. Whether hackers obtained Plaintiff's and Class Members' PII via the Data Breach;

10. Whether Defendants breached their duties to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members; and

11. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## **CAUSES OF ACTION**

### **FIRST CLAIM FOR RELIEF:**

### **NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class and CCU Subclass Against All Defendants)**

171. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

172. Plaintiff brings this claim against PSC on behalf of the Nationwide Class and against CCU on behalf of the CCU Subclass.

173. Defendants knowingly collected, acquired, stored, and/or maintained Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and

protecting the PII from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

174. This duty included obligations to take reasonable steps to prevent disclosure of the PII, and to safeguard the information from theft. Defendants' duties included the responsibility to design, implement, update, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

175. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, policies, and procedures, and the personnel responsible for it, adequately protected the PII of Plaintiff and Class Members.

176. Defendants owed a duty of care to safeguard the PII due to the foreseeable risk of a data breach and the severe consequences that would result from their failure to so safeguard the PII of Plaintiff and Class Members.

177. These duties owed by Defendants included the obligation to properly review, assess, and manage the cybersecurity risk posed by third-party vendors and service providers.

178. Defendants owed a duty of care to safeguard the PII due to the foreseeable risk of a data breach and the severe consequences that would result from their failure to so safeguard the PII.

179. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and those individuals who entrusted them with their PII, which is recognized by laws and regulations including, but not limited to, the FTC Act, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

180. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

181. Defendants' duty to use reasonable care in protecting PII arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect PII that they either acquire, maintain, or store.

182. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII, as alleged and discussed above.

183. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the well-known frequency of cyberattacks and data breaches in the data transfer and storage industry.

184. Therefore, it was foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to Class Members.

185. The imposition of a duty of care on Defendants to safeguard the PII they maintained is appropriate because any social utility of Defendants' conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

186. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are at a current, ongoing, and substantial risk of identity theft and fraud, and Plaintiff and Class Members sustained damages including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent

threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) lost value of their PII; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued risk to their PII, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

187. Plaintiff and Class Members are entitled to compensatory, consequential, general, and nominal damages suffered as a result of the Data Breach.

188. Defendants' negligent conduct is ongoing, in that they still hold the Plaintiff's and Class Members' PII in an unsafe and unsecure manner.

189. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND CLAIM FOR RELIEF:**

**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Nationwide Class and the CCU Subclass Against All Defendants)**

190. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

191. Plaintiff brings this claim against PSC on behalf of the Nationwide Class and against CCU on behalf of the CCU Subclass.

192. Pursuant to FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices and to safeguard Plaintiff's and Class Members' PII.

193. Defendants breached their duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

194. Plaintiff and Class Members are within the class of individuals the FTC seeks to protect.

195. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

196. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

197. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

198. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members face a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) lost value of their PII; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued risk to their PII, which remains in

Defendants' control, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

199. Plaintiff and Class Members are entitled to compensatory, consequential, general, and nominal damages suffered as a result of the Data Breach.

200. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide extended and adequate credit monitoring to all Class Members.

**THIRD CLAIM FOR RELIEF:**

**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and CCU Subclass Members Against Defendant CCU)**

201. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

202. Plaintiff brings this claim against CCU on behalf of the CCU Subclass.

203. As a condition of providing its financial services to Plaintiff and Class Members, Defendant required Plaintiff and Class Members to directly or indirectly entrust in with their PII.

204. As a result of these transactions, Plaintiff and Class Members entered into implied contracts with Defendant by which CCU agreed to safeguard and protect such PII and keep such PII secure and confidential from unauthorized access.

205. When entering into these implied contracts, Plaintiff and Class Members reasonably believed and expected that CCU's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII.

206. Indeed, implicit in these exchanges was a promise by CCU to ensure the PII of Plaintiff and Class Members in its possession would be used to provide the agreed-upon services and that CCU would take adequate measures to protect Plaintiff's and Class Members' PII.

207. Plaintiff and Class Members would not have provided their PII to CCU had they known that CCU would not safeguard their PII as promised or provide timely notice of a data breach.

208. Plaintiff and Class Members fully performed their obligations under their implied contracts with CCU.

209. CCU breached its implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII.

210. As a direct and proximate result of CCU's breach of contract, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 186 above.

211. As a direct and proximate result of CCU's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and Nationwide Class Against Defendant PSC)**

212. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

213. Plaintiff brings this claim against PSC on behalf of the Nationwide Class.

214. Upon information and belief, Progress entered into contracts with its government and corporate customers, including CCU's third-party vendor who used MOVEit, to provide

secure file transfer services to them; services that included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was entrusted to it.

215. Such contracts were made expressly for the benefit of Plaintiff and Class Members, as it was their PII that PSC agreed to receive, store, utilize, transfer, and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class Members was the direct and primary objective of the contracting parties and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

216. PSC knew or should have known that if it were to breach these contracts with its customers, Plaintiff and the Class Members would be harmed.

217. PSC breached its contracts with customers by, among other things, failing to adequately secure Plaintiff's and the Class Members' PII, and, as a result, Plaintiff and the Class Members were harmed by PSC's failure to secure their PII.

218. As a direct and proximate result of PSC's breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained incidental and consequential damages including: (i) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) lost value of their PII; (vii) future costs of identity theft monitoring; and (viii) the continued risk to their PII, which, upon information and belief, remains in PSC's control, and which is subject to further breaches, so long as PSC fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

219. Plaintiff and Class Members are entitled to compensatory, consequential, general, and nominal damages suffered as a result of the Data Breach.

220. Plaintiff and Class Members are also entitled to injunctive relief requiring PSC to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to Plaintiff and all Class Members.

**FIFTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class and the CCU Subclass Against All Defendants)**

221. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

222. Plaintiff brings this claim against PSC on behalf of the Nationwide Class and against CCU on behalf of the CCU Subclass.

223. Plaintiff brings this claim in the alternative to her breach of implied contract and breach of third-party beneficiary claims above.

224. Plaintiff and Class Members conferred a monetary benefit on Defendants by providing Defendants with their valuable PII.

225. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII, which cost savings increased the profitability of the services.

226. Upon information and belief, instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective

security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

227. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of this benefit, which belongs to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

228. Defendants acquired a valuable resource, PII, through inequitable means when they failed to disclose the inadequate security practices previously alleged.

229. Had Plaintiff and Class Members known that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendants. Plaintiff and Class Members have no adequate remedy at law.

230. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

231. Furthermore, as a direct and proximate result of Defendants' unreasonable and inadequate data security practices, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have sustained incidental and consequential damages, including: (i) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out-of-pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) lost value of their PII; (vii) future costs of identity theft monitoring; and (viii) the continued risk to their PII, which remains in Defendants' control, and

which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

232. Plaintiff and Class Members are entitled to compensatory, consequential, general, and nominal damages suffered as a result of the Data Breach.

233. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

234. Moreover, Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

**SIXTH CLAIM FOR RELIEF**

**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class and the CCU Subclass Against All Defendants)**

235. Plaintiff realleges and reincorporates paragraphs 1 through 170 as if fully set forth herein.

236. Plaintiff brings this claim against PSC on behalf of the Nationwide Class and against CCU on behalf of the CCU Subclass.

237. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those at issue here, that are tortious and violate the terms of the federal statutes described in this Complaint.

238. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' PII, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their PII. Plaintiff and Class Members remain at imminent risk that further compromises of their PII will occur in the future.

239. The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect Plaintiff's and Class Members' PII.

240. Defendants still control the PII of Plaintiff and the Class Members.

241. To Plaintiff's knowledge, Defendants have made no announcement that they have changed their data or security practices relating to the PII.

242. To Plaintiff's knowledge, Defendants have made no announcement or notification that they have remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

243. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Progress. The risk of another such breach is real, imminent, and substantial.

244. As described above, actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendants' failure to address the security failings that led to such exposure.

245. There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the breach to meet Defendants' contractual obligations and legal duties.

246. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs at Progress, Plaintiff and Class Members will likely continue to be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

247. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the additional injuries that would result to Plaintiff and Class Members.

248. Plaintiff and Class Members seek a declaration (i) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security; and (ii) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

1. engage internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and promptly correct any problems or issues detected by such third-party security auditors;
2. engage third-party security auditors and internal personnel to run automated security monitoring;
3. audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;
4. purge, delete, and destroy, in a reasonably secure manner, any PII not necessary for their provision of services;

5. conduct regular database scanning and security checks; and

6. routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information including, but not limited to, PII.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class and Subclass, and appointing Plaintiff and her Counsel to represent the Class and Subclass;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including, but not limited to, an order:

1. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

2. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

3. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such

information when weighed against the privacy interests of Plaintiff and Class Members;

4. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

5. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

6. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

7. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

8. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' networks is compromised, hackers cannot gain access to other portions of Defendants' systems;

9. requiring Defendants to conduct regular database scanning and securing checks;

10. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees,

with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

11. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

12. requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

13. requiring Defendants to implement, maintain, regularly review, and revise as necessary, a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

14. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their PII to third parties, as well as the steps affected individuals must take to protect themselves; and

15. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period

of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including, but not limited to, actual, general, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. Disgorgement and restitution of all earnings, profits, compensation, and benefits received as a result of the unlawful acts, omissions, and practices described above;

F. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G. For prejudgment interest on all amounts awarded; and

H. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: February 4, 2026

Respectfully Submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
gary@lcllp.com

*Plaintiffs' Co-Lead Counsel*